1    SEYFARTH SHAW LLP
     James M. Nelson (SBN 116442)
2    Diana R. Craig (SBN 221389)
     400 Capitol Mall, Suite 2350
3    Sacramento, California 95814-4428
     Telephone: (916) 448-0159
4    Facsimile: (916) 558-4839

5    Attorneys for Defendants
     TECHNOLOGY ASSOCIATES INTERNATIONAL
6    CORPORATION and WALT OLESKI

7

8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10

11   INTERLOC SOLUTIONS, INC.            )   Case No. 2:07-CV-01534-LEW-GGH
                                         )
12              Plaintiff,               )   **OPPOSITION TO MOTION FOR**
                                         )   **PRELIMINARY INJUNCTION**
13       v.                              )
                                         )   Date:        August 17, 2007
14   TECHNOLOGY ASSOCIATES               )   Time:        10 a.m.
     INTERNATIONAL CORPORATION, WALT     )   Courtroom:   7
15   OLESKI, CHARLES JOHNSON, CHRIS      )
     RHODES, MICHAEL NUTT and DOES 1     )
16   THROUGH 10, inclusive,              )
                                         )
17              Defendants.              )
                                         )
18   _____)

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .......................................................................................... iii

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL AND PROCEDURAL BACKGROUND ......................................... 3

        A.      Technology Associates International Corporation ................................. 3

        B.      Interloc Solutions ................................................................................... 4

        C.      IBM MAXIMO and Strategic Asset Management Operations ............. 4

        D.      Rhodes Returns to TAIC and Both Nutt and Johnson Join TAIC .......... 5

        E.      Procedural History ................................................................................. 6

III.    ARGUMENT ....................................................................................................... 7

        A.      Interlock Cannot Rely on Inadmissible Evidence and Speculation ........ 7

        B.      Interlock Cannot Meet the Requirements for a Preliminary Injunction ................. 9

                1.      The Balance of Harm Favors TAIC ......................................... 10

                        a.      Interloc Faces No Imminent Irreparable Harm .............. 10

                        b.      The Order Sought by Interloc Order Would Imminently and
                                Unnecessarily Harm TAIC's Business ........................... 11

                2.      Interlock Cannot Succeed on the Merits of Its Claims As Alleged
                        Against TAIC or Oleski ............................................................ 12

                        a.      Plaintiff's Federal Computer Fraud and Abuse Act Fails
                                Against TAIC and Oleski Because Neither Accessed
                                Interloc's Computers .................................................... 12

                        b.      Plaintiff's California Uniform Trade Secret Act Claim Fails
                                Because Interlock has not Demonstrated the Existence of a
                                Protectable Trade Secret ............................................. 13

                                i.      Information on Interloc's Customers is Public
                                        Knowledge and Known in the Industry ............... 14

                                        (a)     Customer Information is on the Internet and a
                                                Matter of Personal Knowledge .............. 14

                                        (b)     Marketing Plans, Production Costs, and Case
                                                Studies Are Available Through IBM and Have
                                                No Independent Value ........................... 15

                                        (c)     Information on Governmental Clients,
                                                is Public Record .................................. 16

ii.    Interloc Employee Information Is Not a Trade
       Secret and Was Known to Johnson as he Recruited
       and Trained Most Employees ...........................................17

c.    Plaintiff Cannot State Claims for Fraud, Breach of
      Confidence, Fiduciary Duty, and Duty of Loyalty against
      TAIC and Oleski...........................................................17

d.    Plaintiff's Intentional Interference with Contractual Relations
      Claim Fails Because Interloc Cannot prevent TAIC or
      Interloc's Former Employees from Extending a Job Offer ...........17

e.    Plaintiff Cannot State a Claim for Conversion against TAIC
      and Oleski .................................................................18

f.    Plaintiff's Intentional Interference with Economic Relations
      Claim Fails Because Interloc Cannot Prevent Former
      Employees from Continuing their Relationships with
      Customers .................................................................19

3.    Public Interest Favors Denial of the Requested Order as an
      Improper Restraint on Trade and Competition...........................21

C.    If the Court Re-Issues a Temporary Restraining Order or Grants a
      Preliminary Injunction, a Substantial Bond Is Required .....................21

IV.   CONCLUSION .........................................................................22

ii

1

# TABLE OF AUTHORITIES

2

## FEDERAL CASES

3

*Amoco Production Co. v. Village of Gambell*,
480 U.S. 531 (1987) ................................................................................................... 9

4

*Associated Gen'l Contractors, Inc. v. Coalition for Economic Equity*,
950 F.2d 1401 (9th Cir. 1991) ................................................................................. 10

5

6

*Dotster, Inc. v. Internet Corp.*,
296 F. Supp. 2d 1159 (C.D. Cal. 2003) .................................................................... 7

7

*First Brands Corp. v. Fred Meyer, Inc.*,
809 F.2d 1378 (9th Cir. 1987) ................................................................................... 9

8

9

*Glenn K. Jackson, Inc. v. Roe*,
273 F.3d 1192 (9th Cir. 2001) ................................................................................. 17

10

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974) ................................................................................................. 14

11

12

*MDTV Med. News, Inc. v. Weinstock*,
2007 U.S. Dist. LEXIS 8806 (S.D. Cal. 2007) ....................................................... 19

13

*Religious Tech. Ctr. v. Netcom On-Line Commun. Servs.*,
923 F. Supp. 1231 (N.D. Cal. 1995) ........................................................................ 13

14

15

*Role Models Am., Inc. v Jones*,
305 F. Supp. 2d 564 (D.C.MD 2004) ...................................................................... 13

16

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
739 F.2d 1415 (9th Cir. 1984) ............................................................................ 9, 10

17

18

## STATE CASES

19

*Burlesci v. Petersen*,
68 Cal. App. 4th 1062 (1998) .................................................................................. 18

20

*DVD Copy Control Assn., Inc. v. Bunner*,
116 Cal. App. 4th 241 (2004) .................................................................................. 14

21

22

*Edwards v. Arthur Andersen LLP*,
142 Cal. App. 4th 603 (2007) .................................................................................. 20

23

*Fischer v. Machado*,
50 Cal. App. 4th 1069 (1996) .................................................................................. 18

24

25

*GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.*,
83 Cal. App. 4th 409 (2000) .................................................................................... 17

26

*Golden State Linen Service, Inc. v. Vidalin*,
69 Cal. App. 3d 1 (1977) ......................................................................................... 20

27

28

*Gordon Termite Control v. Terrones,*
84 Cal. App. 3d 176 (1978) .................................................................................. 15, 20

*Kelton v. Stravinski,*
138 Cal. App. 4th 941 (2006) ......................................................................................... 21

*Kolani v. Gluska,*
64 Cal. App. 4th 402 (1998) ......................................................................................... 20

*Korea Supply Co. v. Lockheed Martin Corp.,*
29 Cal. 4th 1134 (2003) ............................................................................................... 19

*Korean Philadelphia Presbyterian Church v. California Presbytery,*
77 Cal. App. 4th 1069 (2000) ....................................................................................... 10

*Metro Traffic Control v. Shadow Traffic Network,*
22 Cal. App. 4th 853 (1994) ......................................................................................... 18

*Michaelis, Montanari & Johnson v. Superior Court,*
38 Cal. 4th 1065 (2006) ............................................................................................... 16

*Moss, Adams & Co. v. Shilling,*
179 Cal. App. 3d 124 (1986) .......................................................................... 10, 15, 20

*Quelimane Co. v. Stewart Title Guaranty Co.,*
19 Cal. 4th 26 (1998) ................................................................................................... 17

*Reeves v. Hanlon,*
33 Cal. 4th 1140 (2004) .......................................................................................... 17, 18

*State Farm Mutual Automobile Ins. Co. v. Garamendi,*
32 Cal. 4th 1029 (2004) ............................................................................................... 16

*Tele-Count Engineers, Inc. v. Pacific Tel. & Tel. Co.,*
168 Cal. App. 3d 455 (1985) ......................................................................................... 13

*Thompson v. Impaxx, Inc.,*
113 Cal. App. 4th 1425 (2003) ..................................................................................... 14

*Weiss v. Marcus,*
51 Cal. App. 3d 590 (1975) ........................................................................................... 18

## FEDERAL STATUTES

18 U.S.C. § 1030(a)(2)[C] ............................................................................................ 12
18 U.S.C. § 1030(a)(4) ................................................................................................. 12
18 U.S.C. § 1030(a)(5)[C] ............................................................................................ 12
Fed. R. Civ. Proc., Rule 65 (c) ..................................................................................... 21
Fed. R. Evid., Rule 802 .......................................................................................... 5, 7, 8

## STATE STATUTES

Cal. Civ. Code § 3426.1(d) ........................................................................................... 13
Cal. Gov. Code § 6250 *et seq* ..................................................................................... 16

## I.   INTRODUCTION

Plaintiffs speculation that its computer data was provided to or accessed by Technology Associates International Corporation or Mr. Oleski is unfounded.[1]  The elimination of this issue exposes the Interloc case against these Defendants as a naked attempt to obtain through the judicial branch that which statutes of the United States and California expressly forbid. Interloc's proposed injunction forbidding contact with anyone it lists as a current or prospective customer is inconsistent with the prohibitions on restraints of trade under the Sherman Act, 15 U.S.C. §1 and 2, as well as the California Cartwright Act, Business and Professions Code §16600.  The requested ban on any communication with Interloc's current at-will employees ignores the fact that a number of them are former employees of Defendant Technology Associates International Corporation (TAIC) and personal acquaintances of TAIC's current employees. Such a ban is also problematic under the Sherman and Cartwright Acts and inconsistent with the Free Speech and Association provisions of the First Amendment to the U.S. Constitution and Article One, Section Two of the California Constitution.  What Plaintiff demands is an order not far removed from imposing conditions of involuntary servitude on its own employees and all consumers in a market place that it has always shared with TAIC.

Employees frequently move between competitors in this industry.  If they did not, Interloc could not have been created in the first place.  For example, Rhodes was an employee of TAIC, a larger and better established company, before moving to Interloc a couple of years ago. Presumably, Interloc hired Rhodes for his capabilities and knowledge of the industry.  In other words, it wanted his skills not his access to sensitive TAIC data.  Rhodes  returned to TAIC when dissatisfied with Interloc's operations and management.

TAIC and Oleski also have done nothing in violation of the Computer Fraud and Abuse Act or Uniform Trade Secret Act.  TAIC and Oleski are not alleged to have downloaded anything themselves and have not received or used any information belonging to Interloc. Plaintiff has not established that Johnson, Nutt, and Rhodes downloaded information that was

---

[1] / This is established by the Declarations of Oleski and Meyer.  Although, Mr. Watson may be proud of his floundering company, the reality is that neither he nor Interloc have lawfully protected information TAIC wants.

1

1   | not personal to them or to which they were not entitled.  At present, Interloc has provided
2   | nothing but conjecture that anything that was downloaded by its employees was anything other
3   | than publicly available, common knowledge, or information available/known within in the
4   | industry.  Indeed, Interloc has not specifically identified what it claims was taken and/or offered
5   | any proof to support its status as protected.

6   |     The unfortunate truth is that Interloc wants to intervene only to salvage its own
7   | marketplace failures and self-inflicted human resource miss-steps.  This fact emerges from the
8   | Affidavit of Interloc's CEO when viewed in context.  Eclipse tried to build a competitor for a
9   | specifically targeted portion of TAIC's business in 2005.  (Watson Affidavit ¶ 2.)  It hired Mr.
10  | Rhodes and others from TAIC.  (*See* Watson Affidavit¶ 4.)  It decided to use the MAXIMO
11  | platform just as TAIC and other competitors had. Interloc brought in Mr. Johnson who was
12  | familiar to many in the industry due to his involvement in the company that created the
13  | MAXIMO software before it was acquired by IBM.  (*Ibid.*)  Interloc hired more TAIC
14  | employees.  Mr. Watson and Mr. Johnson apparently had a number of disagreements leading to
15  | the latter's dissatisfaction.  (Watson Affidavit ¶¶ 10, 12 and Ex. D.)  Watson, on behalf of
16  | Interloc, decided to fire Johnson on July 13, 2007 but botched the execution leading to an
17  | unprofessional employment termination that had a negative effect on morale in general and,
18  | apparently, employee loyalty in particular.  (*See* Watson Affidavit¶ 13 and Ex D; Plaintiffs
19  | Memorandum of Points and Authorities in Support of TRO pg. 3, lines 20-22.)

20  |     It also appears that Interloc, having built itself on hiring the employees of others, saw no
21  | need for employment agreements or confidentiality agreements.  It appears none were put in
22  | place.  Having fired the shot that stampeded its employees (terminating Johnson), Interloc lost
23  | the confidence of the relatively short term employees it hired from others and they began voting
24  | with their feet.  This lawsuit is no more than an effort to intimidate Interloc's former employees,
25  | restrain the mobility of its current at-will employees, and preclude its customers from seeking
26  | services in a competitive marketplace.
27  | ///
28  | ///

1    Plaintiff's requested relief is also deliberately overbroad and, thus, undermines

2  California's strong public policy favoring the freedom of employees and creates restraints on

3  competition that are against the public interest. Plaintiff truly seeks to protect their small and

4  slipping market share by ensuring their existing clients do not follow the employees who they

5  know and trust (but who no longer trust Mr. Watson and Interloc), as some employees leave to

6  work for an employer that will allow them to share in what they create.

7  **II.    FACTUAL AND PROCEDURAL BACKGROUND**

8       **A.    Technology Associates International Corporation**

9    TAIC was founded in October 2000 as a small business enterprise providing consulting

10 services to both public- and private-sector clients in the areas of Information Technology

11 solutions (including Geographic Information System ["GIS'] services), program and project

12 management support, environmental resource management, and business and strategic asset

13 management services. (Meyer Decl. ¶ 2; Oleski Decl. ¶ 2.) Walt Oleski is TAIC's current

14 president and has been with TAIC since 2003. (Oleski Decl. ¶ 1.)

15    TAIC has experienced considerable growth in various areas over the past 7 years.

16 Stratigic asset management has been one of TAIC's core competencies and generated significant

17 revenues since TAIC's inception. (Meyer Decl. ¶ 3; Oleski Decl. ¶ 3.) This division of TAIC

18 takes an existing software product like MAXIMO and integrates it with a customer's existing

19 systems. (Meyer Decl. ¶ 4.) A large part of TAIC's strategic asset management business is with

20 the Federal Government, including the U.S. Marine Corps. (TAIC Customer List

21 <http://www.taic.net/ clients.aspx.> (August 8, 2007).) (Meyer Decl. ¶ 4; Oleski Decl. ¶ 4.) In

22 fact, TAIC developed a unique GIS overlay application that allowed special location in tracking

23 assets for the Marine Corp. Interloc's website claims they also have this capability. However,

24 developing marketable applications like this for customers is not common in this industry.

25 Typically, large scale strategic asset management competitors deal only with existing software,

26 like MAXIMO, and assist customers by integrating MAXIMO with other software systems.

27 (Oleski Decl. ¶ 4.)

28 ///

3

**B.    Interloc Solutions**

Interloc is smaller and less diverse than TAIC and was created in 2005. Interloc appears to be solely a strategic asset management firm that began as part of Eclipse Solutions, Inc. (Meyer Decl. ¶ 5.) Eclipse and Interloc remain related and continue to share a similar client base of primarily state and local government entities. (C.f. Interloc Customer List <http://www.interloc solutions.com/customers. asp> (August 8, 2007); Eclipse Solutions Customer List <http://www.eclipsesolutions.com/ clientinfo /client_ clientlist.html.> (August 8, 2007).) (Meyer Decl. ¶ 5.)

In 2005, four TAIC employees left to join Eclipse in its new strategic asset management division. One of the employees that left TAIC to build Interloc's new division was Chris Rhodes. When Rhodes left three of TAIC's clients went with him including King County. (Meyer Decl. ¶ 6; Oleski Decl. ¶ 6.) Charles Johnson was already at Interloc, after leaving MRO, the company that developed MAXIMO, which was subsequently purchased by IBM. (Oleski Decl. ¶ 5.) Other TAIC employees recruited to Interloc include Steve Meisner, Jim Cullen and Jim Hershberger. Notably, Interloc recruited Hershberger in an effort to obtain TAIC's GIS capabilities with respect to strategic asset management. (Oleski Decl. ¶ 6.)

**C.    IBM MAXIMO and Strategic Asset Management Operations**

The strategic asset management operations of both TAIC and Interloc use IBM MAXIMO software, although either could use products from competitors like Oracle or SAP as well depending on what a customer wants. (Oleski Decl. ¶ 7.) TAIC does not generally re-sell MAXIMO software and believes that Interloc does not independently sell MAXIMO either. Instead both typically partner with IBM, who sells the customer the software. (MAXIMO Software Details <http://www-306.ibm.com/ software/sw-atoz/indexM.html.>) TAIC and Interloc then provide implementation services, which typically include installing MAXIMO, integrating it with existing software, and performing some data entry of assets. (Meyer Decl. ¶ 7; Oleski Decl. ¶ 7.)

IBM will assist any implementation firm, like TAIC or Interloc, with marketing and sales presentations and can provide materials to help secure a sale, although advertising materials are

4

1    uncommon. IBM consultants will also help implementation firms develop bids and determine

2    pricing by helping the implementation firms determine time estimates for projects. IBM

3    consultants even assist with writing customer proposals. (Meyer Decl. ¶ 8; Oleski Decl. ¶ 8.)

4    There is generally nothing unique or proprietary about this data or process as IBM does the same

5    for any company. (Meyer Decl. ¶ 8; Oleski Decl. ¶ 9.) Because of this, customers generally

6    choose implementation firms based on relationships and personality. (Oleski Decl. ¶ 9.)

7    **D.    Rhodes Returns to TAIC and Both Nutt and Johnson Join TAIC**

8        In May of 2006 Rhodes contacted Oleski and expressed an interest in returning to TAIC.

9    (Oleski Decl. ¶ 11.) Rhodes mentioned to Okeski that Charles Johnson may also be interested in

10    discussing employment opportunities with TAIC. (Oleski Decl. ¶ 11.) Shortly thereafter, Oleski

11    received a call from Johnson. Oleski recalls that Johnson said he was interested in discussing

12    TAIC's business and meeting Oleski. On a subsequent trip to San Diego, Johnson and Oleski

13    met. (Oleski Decl. ¶ 12.) Plaintiff alleges that Johnson claimed that Oleski offered Johnson

14    $500.000 to come to TAIC and steal Interloc's business.[2] Oleski never made any such

15    statement. (Oleski Decl. ¶ 12.) This is substantiated by the compensation Johnson, Rhodes, and

16    Nutt received.

17        After making these initial contacts in the spring of 2007, both Rhodes and Johnson

18    decided to stay at Interloc. It was not until July 14, 2007, the day after he was fired, that Johnson

19    again expressed an interest in TAIC. He called Oleski and the two tentatively agreed that

20    Johnson would join TAIC. (Oleski Decl. ¶ 13.) Rhodes and Nutt followed Johnson. TAIC

21    matched what they reported their existing Interloc salaries were and gave them standard stock

22    options for TAIC employees of their level. Johnson received options for approximately 15,000

23    shares and Rhodes and Nutt received similar options for approximately 10,000 shares each. The

24    total present value of these options would not be more than $20,000. (Meyer Decl. ¶ 11.)

25    ///

26    [2] / Plaintiff relies on this allege statement by Oleski to Johnson, which Johnson then allegedly reported to Watson to establish that TAIC knew of existing contractual relationships.
27    (Plaintiff's MPA In Support of TRO, pp. 3, 13.) In addition to the fact that Oleski denies ever making such a statement, as presented by plaintiff it is inadmissible hearsay and cannot be
28    relied upon. (Fed. R. Evid., Rule 802.)

1        When TAIC hired Johnson, Nutt, and Rhodes, and before learning of Interloc's claims,

2 TAIC counseled each of these employees that "there is nothing we want from your prior

3 employer and we would never ask for or accept anything from your prior employer." (Oleski

4 Decl. ¶ 14.) This admonition is given to all entering employees as a matter of course. At the

5 time, TAIC and Olseki were unaware of any downloads Johnson, Nutt, or Rhodes may have

6 made from Interloc's systems. (Oleski Decl. ¶ 14.) Since plaintiff initiated litigation, TAIC

7 counseled each of these employees not to bring to TAIC, upload or use, anything that they may

8 have downloaded from Interloc. (Meyer Decl. ¶ 13; Oleski Decl. ¶ 15.) TAIC has since

9 confirmed through its IT department, that no data has been uploaded to any of its systems from

10 Johnson, Nutt, and Rhodes. (Meyer Decl. ¶ 13; Oleski Decl. ¶ 15.)

11        Since Johnson, Nutt, and Rhodes joined TAIC, it has acquired no contracts based on their

12 contacts or that are associated in any way with Interloc. (Meyer Decl. ¶ 14; Oleski Decl. ¶ 16.)

13 It had one customer, Aramark Senior Living Services, express an interest in following these

14 individuals to TAIC but nothing resulted. (Oleski Decl. ¶ 16.)

15       **E.**    **Procedural History**

16        On Friday, July 27, 2007, plaintiff filed a civil complaint against TAIC, Oleski, Johnson,

17 Rhodes, and Nutt. On Monday, July 30, 2007, plaintiff filed a motion for a temporary

18 restraining order. TAIC was served on August 3, 2007 and Mr. Oleski accepted service through

19 counsel. On August 8, 2007, the court issued the order Plaintiff requested without a hearing or

20 opportunity for defendants to respond. The restraining order sought by plaintiff and ordered by

21 the court on a temporary basis pending a hearing on preliminary injunction does the following:

22 (1) requires TAIC and Oleski to return data neither of them possess; (2) enjoins TAIC and Oleski

23 (as an individual) from communicating by any means with Interloc employees, and; (3) enjoins

24 TAIC and Oleski (as an individual) from communicating by any means with any of Interloc's

25 *current or prospective* customers. Interloc was not required to post any bond. (Order Dated

26 August 7, 2007.) The hearing on the preliminary injunction is scheduled for August 17, 2007.

27        On August 10, 2007, these Defendants filed a motion to vacate or modify the TRO as to

28 them. Among the issues raised was that the portion of the TRO purporting to ban any contact

1   with current or prospective customers of Interloc was vague as no list was provided and overly

2   broad given that Interloc and TAIC have common customers.  Moreover the ban on all contact

3   with current Interloc customers suffered from the same problems and were compounded by the

4   fact that the result of the TRO was an employee non-competition obligation otherwise void

5   under Business and Professions Code §16600.  Defendant also protested the lack of a bond.  That

6   motion remains pending.

7   **III.    ARGUMENT**

8        **A.    Interlock Cannot Rely on Inadmissible Evidence and Speculation**

9        As the court is aware, both temporary restraining orders and preliminary injunctions

10  are very serious and extraordinary remedies.  They must be based on reliable evidence that

11  supports granting the relief sought not mere argument, conjecture. speculation or inadmissible

12  hearsay.  The party seeking a preliminary injunction must present specific "*credible and*

13  *admissible* evidence that such damage threatens [its] businesses with termination." (*Dotster,*

14  *Inc. v. Internet Corp.*, 296 F. Supp. 2d 1159, 1164 (C.D. Cal. 2003) (emphasis added).)  The

15  evidence provided by plaintiff falls far short of this standard.  The evidence Plaintiff submitted

16  consisted of declarations by the following:

17       • Rohith Ramamurphy (describing a July 17. 2007 contact from Mr. Rhodes

18           requesting information in order to make an employment offer);

19       • Michael Watson Interloc's CEO (these Defendants object to paragraphs 10,

20           12,14,15,18-22, 24, 27-29, and Ex B as inadmissible hearsay pursuant to Fed.

21           R. Evid. 802;

22       • Jason Venhuizen (describing conversations with Johnson to which these

23           Defendants object on hearsay grounds pursuant to Fed. R. Evid. 802);

24       • Manuel Barandas (describing Interloc's analysis of its computer systems to

25           determine whether information was downloaded);

26       • Dave Dawson (describing conversations with Johnson to which these

27           Defendants object on hearsay grounds pursuant to Fed. R. Evid. 802);

28  ///

1
2

- Jim Charboneau (describing communications to which these Defendants object on hearsay grounds pursuant to Fed. R. Evid. 802);

3
4
5
6

- Erik Greene (describing a forensic computer examination of Interloc's system and offering an expert opinion [without qualification foundation] that employees of Interloc downloaded information but not detailing what was copied).

7       The only admissible evidence presented by plaintiff relates to access to the computer
8    system by then current Interloc employees and alleged copying of data that never made its
9    way to these Defendants. The inadmissible evidence adds little as it pertains solely to things
10   attributed to Johnson and seem focused exclusively on communications between him and
11   Interloc employees with at-will relationships.

12       Plaintiff shrieks with near hysteria about the "2 gigabytes" of allegedly proprietary
13   data but never describes in any detail what the data was. As Defendants have never accessed
14   the alleged data they are left to speculate. The court is left in no better factual position.

15       That said, it does not take a forensic computer expert to appreciate that copying two
16   gigabytes of material, if it occurred, is not necessarily an indicator of massive amounts of data.
17   The court can confirm for itself, for example, that the PDF version of the complaint is
18   approximately 5 megabytes. The Microsoft Word version of this brief, without accompanying
19   declarations or materials, exceeds 1 megabyte. The data file in a personal Microsoft Outlook
20   folder can exceed 250 megabytes. A 10 mega pixel camera in raw format may generate
21   images in the 100 megabyte range such that 2 gigabytes would translate into 20 photos.
22   Plaintiff also suggests that there may have been some programs in the alleged down load.

23       The point is that without knowing what was allegedly downloaded one can only
24   speculate as to whether whatever was copied has significance. For example, if what was
25   copied consisted of IBM templates or other material as to which both companies are licensed
26   users it has no trade secret value at all. It plainly has no significance as to TAIC and Oleski.
27   Without the list of allegedly copied/downloaded material the environment does not exist for
28   determining whether Plaintiff has met its burden of proving it had protected information.

1    Of far greater importance here is that as to which Interloc offers no proof of any kind.

2  For example:

3  - There is no evidence that any list of current or prospective customer of Interloc

4    was protected or taken;

5  - There is no evidence that Interloc lost sales or revenue due to anything TAIC

6    or Mr. Oleski did;

7  - There is no evidence any Interloc information was protected by having even

8    the most basic of confidentiality agreements;

9  - There is no detailed description of precisely what Interloc considers to be it's

10    proprietary information, computerized or not;

11  - Despite very direct allegations of criminal conduct there is no evidence of any

12    kind that these Defendants violated the Computer Fraud and Abuse Act as

13    alleged in the first two claims;

14  - There is no evidence of what confidential information Interloc claims was

15    communicated by Johnson in June or how he knows it was communicated.

16    In sum, there is insufficient evidence before the court of any inappropriate behavior by

17  Interloc or Mr. Oleski to support an injunction.

18    **B.    Interlock Cannot Meet the Requirements for a Preliminary Injunction**

19    A preliminary injunction is a provisional remedy issued to preserve the status quo and

20  prevent irreparable loss of rights prior to judgment. (*Sierra On-Line, Inc. v. Phoenix Software,*

21  *Inc.,* 739 F.2d 1415, 1422 (9th Cir. 1984).) Such relief never issues as a matter of course, as,

22  "[i]n each case, a court must balance the competing claims of injury and must consider the effect

23  on each party of the granting or withholding of the requested relief." (*Amoco Production Co. v.*

24  *Village of Gambell*, 480 U.S. 531 (1987).)

25    It is extraordinary relief, and to prevail, a plaintiff must demonstrate: (1) a likelihood of

26  success on the merits; (2) a *significant, imminent* threat of *irreparable injury*; (3) that the balance

27  of hardships favors plaintiff; and (4) that any public interest implicated favors granting the

28  injunction. (*First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1381 (9th Cir. 1987); *see*

9

1    *also Associated Gen'l Contractors, Inc. v. Coalition for Economic Equity,* 950 F.2d 1401, 1410

2    (9th Cir. 1991); *Sierra On-Line,* at 1423 (plaintiff must show that necessary facts can be proven

3    at trial.).)

4         A speculative injury is insufficient to warrant granting a preliminary injunction.  "An

5    injunction cannot issue in a vacuum based on the proponents' fears about something that may

6    happen in the future.  It must be supported by *actual evidence* that there is a realistic prospect

7    that the party enjoined intends to engage in the prohibited activity."  (*Korean Philadelphia*

8    *Presbyterian Church v. California Presbytery*, 77 Cal. App. 4th 1069, 1084 (2000) (emphasis

9    added).)

10        **1.**     **The Balance of Harm Favors TAIC**

11        In considering the appropriateness of injunctive relief, the court should balance the

12   possible harm to plaintiff from denying the injunction against the possible harm to the defendant

13   from granting it. (*Amoco Production Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 542

14   (1987).)  Here Interloc faces no imminent harm due to improper activity of TAIC or Oleski but

15   consequences to TAIC are concrete and devastating.

16        **a.**     **Interloc Faces No Imminent Irreparable Harm**

17        Any harm Interloc alleges is speculative at best.  TAIC ordered Johnson, Nutt, and

18   Rhodes not to use or bring any information that may have been downloaded to TAIC and, as

19   explained below, nothing these individuals could have downloaded has proprietary value in this

20   industry. (Meyer Decl. ¶ 8; Oleski Decl. ¶ 9.)  TAIC's computers show nothing has been

21   uploaded by these individuals. (Meyer Decl. ¶ 13.)  Interloc has not lost any of its customers to

22   TAIC, although companies should be free to leave with the employees with whom they built

23   relationships if they choose. (Meyer Decl. ¶ 14; Oleski Decl. ¶ 16.) (*Moss, Adams & Co. v.*

24   *Shilling*, 179 Cal. App. 3d 124, 128-29 (1986).)

25        Interloc also cannot keep employees from leaving to work for a competitor.  Presumably,

26   Interloc weighed the inconvenience in losing access to Mr. Johnson before firing him.  Having

27   been formed in 2005, none of Interloc's employees are long term and all were relatively recent

28   recruits from other enterprises.  As evidenced by Johnson, Rhodes, and Nutt at least a portion of

1   Interloc employees are dissatisfied with its management and operation.  The movement of

2   employees is also common in this industry as different implementation firms secure large

3   contracts and is not "irreparable injury" or the proper subject for a restraining order.  Interloc is

4   not entitled judicial insulation from the effects of the work environment Interloc created for itself

5   in the form of a court order freezing its employees or customers in place.

6            **b.      The Order Sought by Interloc Order Would Imminently and
                     Unnecessarily Harm TAIC's Business**
7

8        The order sought by plaintiff and granted by the court on a temporary basis is

9   prohibitively overbroad and would have devastating results to TAIC and Mr. Oleski if continued.

10  The order enjoins TAIC from communicating by any means with Interloc employees or with any

11  of Interloc's *current or prospective* customers.  This is immediately detrimental to TAIC because

12  it has long standing relationships and contracts with customers in areas other that strategic asset

13  management that are also customers of Interloc for that limited purpose.  (Meyer Decl. ¶ 15;

14  Oleski Decl. ¶ 17.)  For example SAIC, IBM, and Sempre are Interloc strategic asset

15  management customers whom TAIC performs other services for.  (Interloc Customer List

16  <http://www. interlocsolutions.com/ customers. asp>(August 8, 2007).)  TAIC does several

17  hundred thousand dollars of environmental consulting for Sempre that it will lose  if it cannot

18  communicate with this client.  (Meyer Decl. ¶ 16.)

19       The order also does not account for the complexity of relationships involved with these

20  clients.  Steve Meyer, TAIC's current Executive Vice President and COO is a former CFO of

21  SAIC.  (Meyer Decl. ¶ 16.)  Interloc accessed this client when Jim Cullen left TAIC for Interloc

22  and is believed to be Interloc's only point of contact with this company.  (Oleski Decl. ¶ 18.)

23  Still, TAIC has approximately $100,000 of existing business with SAIC in other areas that it

24  would forfeit under this order.  (Meyer Decl. ¶ 16.)  TAIC should not be barred from using its

25  independent contacts at SAIC to pursue strategic asset management opportunities.   (Oleski Decl.

26  ¶ 18.)

27       The order would also preclude TAIC from communicating with IBM.  This is devastating

28  on many levels.  First, all MAXIMO Strategic Asset Management integration firms must work

                                          11

with IBM for software, manuals, templates. Barring TAIC from communicating with IBM would preclude TAIC from performing any integration services for customers who want MAXIMO software. (Meyer Decl. ¶ 17; Oleski Decl. ¶ 19.) This would effectively cripple this aspect of TAIC's business, costing it between three and five million dollars in losses per year. (Meyer Decl. ¶ 17.)

The order with respect to IBM presents another problem as well. TAIC is on the verge of acquiring a company with 14.5 million dollars in revenues per year. This company sells hardware and IBM is its primary vendor. (Meyer Decl. ¶ 18; Oleski Decl. ¶ 20.) Any order prohibiting communication or contacts with IBM would preclude this transaction, costing TAIC an anticipated 14.5 million in earnings. (Meyer Decl. ¶ 18.)

> **2.    Interlock Cannot Succeed on the Merits of Its Claims As Alleged Against TAIC or Oleski**
>
> > **a.    Plaintiff's Federal Computer Fraud and Abuse Act Fails Against TAIC and Oleski Because Neither Accessed Interloc's Computers**

A violation of the Computer Fraud and Abuse Act occurs when any person:

> (a) intentionally accesses a computer without authorization or exceeds authorized access and thereby obtains information from any protected computer if the conduct involved an interstate or foreign communication. [18 U.S.C. § 1030(a)(2)(C)]; or

> (b) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period. [18 U.S.C. § 1030(a)(4)]

> (c) intentionally accesses a protected database without authorization, and, as result of such conduct, causes damage. [18 U.S.C. § 1030(a)(5)(C)]

Interloc alleges that all defendants, including TAIC and Oleski, are liable to it under the CFAA. However, Interloc cannot state a claim against TAIC or Oleski under the CFAA and offer no factual support to the contrary.

The CFAA requires the individual or company to actually access the compute(s) before an offense is stated. Even assuming impermissible access by Johnson, Rhodes, and Nutt while they were employed by Interloc, no one at TAIC accessed Interloc's computers. Moreover,

1   TAIC never received or used any information accessed from Interloc's computer systems. Even

2   if they had it still would not constitute a violation of the Act. (*Role Models Am., Inc. v. Jones*,

3   305 F Supp 3d 564 (D.C.MD 2004) (receiving electronic information is not same as accessing

4   the computer from which information derived and will not support liability under the CFAA).)

<b>b.    Plaintiff's California Uniform Trade Secret Act Claim Fails<br>Because Interloc has not Demonstrated the Existence of a<br>Protectable Trade Secret</b>

7       To establish a violation under California's version of the Uniform Trade Secrets Act, a

8   plaintiff must show that it has a trade secret and that a defendant has been unjustly enriched by

9   the improper appropriation, use or disclosure of a "trade secret." (Cal. Civ. Code § 3426.1(d);

10  *Religious Tech. Ctr. v. Netcom On-Line Commun. Servs.*, 923 F. Supp. 1231, 1250-51 (N.D. Cal.

11  1995).) A "trade secret" is defined as information, including a formula, pattern, compilation,

12  program, device, method, technique, or process, that:

> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

> (Cal. Civ. Code § 3426.1(d).)

18      The burden of proof on the existence of a trade secret rests with the party asserting it.

19  (*Tele-Count Engineers, Inc. v. Pacific Tel. & Tel. Co.*, 168 Cal. App. 3d 455, 463 (1985).)

20  Plaintiffs have not met this standard nor demonstrated that they can meet this standard.

21      Interloc has no evidence that Oleski or TAIC have Interloc's trade secrets. There is also

22  no evidence that Johnson, Nutt, or Rhodes downloaded contact information for Interloc's

23  employees or protectable information on its customers, if indeed Interloc has protected

24  information. Nonetheless, the majority of the alleged confidential information Interloc assumes

25  was taken does not meet the statutory definition of a trade secret because it is known to the

26  public and within the industry and therefore does not have independent economic value.

27      As discussed below, Interloc's and TAIC's clients are published on the internet and

28  known throughout the industry. IBM provides all MAXIMO integration firms with

13

1   marketing, policy and sales materials.  Contact information for Interloc's employees was

2   known to Johnson because he hired and trained these individuals and their identity is common

3   knowledge in the industry.

4             **i.**      **Information on Interloc's Customers is Public**
                  **Knowledge and Known in the Industry**

5

6        In order to qualify as a trade secret, the information "must be secret, and must not be of

7   public knowledge or of a general knowledge in the trade or business." (*Kewanee Oil Co. v.*

8   *Bicron Corp.*, 416 U.S. 470, 475 (1974).)  Customer information alleged by Interloc to have

9   trade secret status is vague at best.  Evidence on the protected customer information is non-

10  existent.  Speculative items identified in Interloc's briefing include customer information,

11  including lists, pricing and marketing materials, advertising strategy, and project/case plans.

12  However, this information is publicly available, through IBM or groups like MAXIMO World,

13  and ascertainable to persons in the business.  It is, therefore, not a protectable trade secret.  As

14  discussed below, what Interloc truly seeks is a restraint on trade and competition in violation of

15  Business and Professions Code § 16600 (voiding contracts restraining engagement in lawful

16  business).

17            **(a)**     **Customer Information is on the Internet and a**
                  **Matter of Personal Knowledge**

18

19       Interloc publishes information on all of its customers on the internet in a database

20  searchable by state, region, or industry.  (Interloc Customer List <http://www.interloc

21  solutions.com/customers. asp>(August 8, 2007).) (Meyer Decl. ¶ 10.)  This precludes this data

22  from acquiring trade secret status. (*Thompson v. Impaxx, Inc.*, 113 Cal. App. 4th 1425, 1428

23  (2003) (identity of customers and potential customers were not trade secrets in that respondents

24  had not made any effort to keep the names of customers and potential customers secret as

25  evidenced by customer names posted on company web site.); *DVD Copy Control Assn., Inc. v.*

26  *Bunner*, 116 Cal. App. 4th 241, 251 (2004) (unauthorized internet postings can extinguish trade

27  secret rights).)

28  ///

14

1   Moreover, an individual employee's knowledge of potential customers within a business

2   or industry is not a trade secret pursuant to Business and Professions Code § 16600. (*Gordon*

3   *Termite Control v. Terrones*, 84 Cal. App. 3d 176 (1978).) The court also addressed this issue in

4   *Moss, Adams & Co. v. Shilling*, 179 Cal. App. 3d 124, 128-29 (1986). All MAXIMO customers

5   are well known in the industry through connections with IBM and groups like MAXIMO World.

6   (Meyer Decl. ¶ 9; Oleski Decl. ¶ 10.)

7   In *Moss, Adams*, an accounting firm brought an action against its former employees who

8   had obtained names and addresses from a company Rolodex to mail notices of the formation of

9   their own firm. (*Id.* at p. 126.) On plaintiff's appeal, the court reviewed the record, which

10   indicated that defendants had signed an employment agreement designating client names as trade

11   secrets and prohibiting solicitation of clients. (*Ibid.*) In spite if this agreement, however, the

12   court held that while former employees were not entitled to use trade secrets to announce a

13   change of employment, the court further held that the names and addresses used by defendants

14   were not trade secrets because the clients were personally known to them, and the addresses

15   were public. (*Id.* at pp. 128-130.)

16   As in *Moss, Adams,* the customer information at issue here is public. MAXIMO

17   Integration is also a narrow industry, in which the customers are generally known. This is

18   fortified by their common connection with IBM and evidenced through groups like MAXIMO

19   World at which self-identified customers gather and network. (<www.MAXIMOworld.com>

20   (August 9, 2007).)

21                    **(b)    Marketing Plans, Production Costs, and Case
                                Studies Are Available Through IBM and Have
22                                No Independent Value**

23   IBM MAXIMO implementation firms all have access to the same IBM software,

24   marketing, and plan materials, such as those likely at issue here.  IBM will assist any

25   implementation firm with marketing and sales presentations and can provide materials to help

26   secure a sale, although advertising materials are uncommon. (Meyer Decl. ¶ 8; Oleski Decl. ¶ 8.)

27   (IBM Partner Resources <http://www-1.ibm.com/partnerworld/ pwhome.nsf/weblook/

28   pub_benefits.html.> (August 9, 2007).) IBM consultants will also help implementation firms

15

1   develop bids and determine pricing by helping implementation firms determine time estimates

2   for projects. IBM consultants even assist with writing customer proposals. (Meyer Decl. ¶ 8;

3   Oleski Decl. ¶ 8.) There is generally nothing unique or proprietary about this data and it has no

4   independent value as IBM does the same for any company.   (Meyer Decl. ¶ 8; Oleski Decl. ¶ 9.)

5          The alleged protected information is also commonly published on the internet. Interloc's

6   web site also describes its clients, partners, and its marketing approach. In fact, firms and

7   individuals providing consulting services regularly exchange information through industry

8   webinar sessions and group affiliations. Eclipse Solutions also publishes case studies and

9   strategies for state agency clients similar to or overlapping with Interloc's customers. (Eclipse

10  Solutions Case Studies <http://www.eclipsesolutions.com /clientinfo/client_case.html: (August

11  8, 2007) (state agency client).) The availability of this type of information coupled with the fact

12  that IBM performs these same services for all integration firms,[3] indicates that this information is

13  simply not that valuable. As it does not have independent economic value, this information lacks

14  trade secret status.

15                    **(c)     Information on Governmental Clients is Public**
                                 **Record**

16

17          Any pricing information, contracts, or any communication Interloc has with its State,

18. Local or other Governmental clients that may be at issue here is also a matter of public record

19  pursuant to the California Public Records Act (PRA). (Cal. Gov. Code § 6250 *et seq.*; *Michaelis,*

20  *Montanari & Johnson v. Superior Court,* 38 Cal. 4th 1065 (2006) (public disclosure of

21  competing proposals submitted to a public agency as part public contract process may await

22  conclusion of negotiation process but should occur before final contract approval).) As such,

23  this information is not subject to trade secret protection unless it falls with in the narrow

24  exception set forth under Cal. Gov. Code § 6254. (*State Farm Mutual Automobile Ins. Co. v.*

25  *Garamendi,* 32 Cal. 4th 1029 (2004) (information submitted to Insurance Commissioner that was

26  not within the PRA's statutory exemption from disclosure could not acquire trade secret status).)

---

27  [3] / Sample case studies are also available through IBM for a range of industries. (http://www-
28  306.ibm.com/software /tivoli/products/MAXIMO-oil-gas/ (August 8, 2007) (Robins Air Force
    Base).)

SCI 17085222.8

1

2

           ii.     **Interloc Employee Information Is Not a Trade Secret and Was Known to Johnson as he Recruited and Trained Most Employees**

3      There is no authority supporting the view that the type of general employee information

4 allegedly at issue in this case can qualify as trade secret. (*GAB Business Services, Inc. v. Lindsey*

5 *& Newsom Claim Services, Inc.*, 83 Cal. App. 4th 409, 428-429 (2000) (employee salary

6 information, although secret, had no independent economic value and thus was not a trade

7 secret) (disapproved on other grounds in *Reeves v. Hanlon*, 33 Cal. 4th 1140 (2004).) Moreover,

8 contact information for the employees TAIC would have hired was well known to Johnson as he

9 hired and trained these individuals while at Interloc. (Oleski Decl. ¶ 5.) As discussed above, a

10 former employee's personal knowledge does not constitute trade secret. Individuals working in

11 this narrow field are also common knowledge in the industry. For example TAIC's CIO could

12 identify everyone working in this area and their current company. (Meyer Decl. ¶ 9.)

13

14

           c.     **Plaintiff Cannot State Claims for Fraud, Breach of Confidence, Fiduciary Duty, and Duty of Loyalty against TAIC and Oleski**

15      Plaintiff properly limits these claims to exclude TAIC and Oleski. Neither TAIC nor

16 Oleski were in a relationship with Interloc creating any fiduciary duty or duty of loyalty as

17 required with these claims. Neither TAIC nor Oleski made or are alleged by Plaintiff to have

18 made any knowingly false misrepresentation to Interloc. (*Glenn K. Jackson, Inc. v. Roe*, 273

19 F.3d 1192, 1201 (9th Cir. 2001) (elements for fraud claim).

20

21

           d.     **Plaintiff's Intentional Interference with Contractual Relations Claim Fails Because Interloc Cannot prevent TAIC or Interloc's Former Employees from Extending a Job Offer**

22      To prevail on a cause of action for intentional interference with contractual relations, a

23 plaintiff must plead and prove: (1) the existence of a valid contract between the plaintiff and a

24 third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts

25 designed to induce a breach or disruption of the contractual relationship; (4) actual breach or

26 disruption of the contractual relationship; and (5) resulting damage. (*Quelimane Co. v. Stewart*

27 *Title Guaranty Co.*, 19 Cal. 4th 26, 56 (1998).)

28 ///

1    Plaintiff has alleged that solicitations to its current and former employees, including Nut

2    Rhodes, and Johnson, constitute intentional interference with their "at-will" employment

3    contracts. However, this claim cannot be sustained where employment was or is at will. (*Reeves*

4    *v. Hanlon,* 33 Cal. 4th 1140, 1151 (2004).) "The economic relationship between parties to

5    contracts that are terminable at will is distinguishable from the relationship between parties to

6    other legally binding contracts." (*Reeves, supra*, 33 Cal. 4th at p. 1151.)  In recognition of this

7    distinction, the court in *Reeves,* held that:

8         [a] competitor is therefore free, for his own competitive advantage, to obtain the future
          benefits for himself by . . . offering an employee of the plaintiff more money to work for
9         him or by offering a seller higher prices for goods, and he may make use of persuasion or
          other suitable means, all without liability. Under this analysis, an interference with an at-
10        will contract properly is viewed as an interference with a prospective economic
          advantage, a tort that similarly compensates for the loss of an advantageous economic
11        relationship but does not require the existence of a legally binding contract.

12    Thus, a plaintiff can only recover for a defendant's interference with an at-will

13    employment relationship under the tort of interference with a prospective economic advantage.

14    As discussed below, this cause of action carries a higher burden under which a plaintiff must

15    plead and prove that the defendant engaged in an independently wrongful act that induced an at-

16    will employee to leave the plaintiff. (Id. at pp. 1151-1152.)  "Under this standard, a defendant is

17    not subject to liability for intentional interference if the interference consists merely of extending

18    a job offer that induces an employee to terminate his or her at-will employment." (*Id.* at p. 1153;

19    *see also Metro Traffic Control v. Shadow Traffic Network,* 22 Cal. App. 4th 853, 862 (holding

20    that a company's hiring of its competitor's at-will personnel was not unfair competition.).)

21                    e.    **Plaintiff Cannot State a Claim for Conversion against TAIC
                           and Oleski**
22

23    "Conversion is any act of dominion wrongfully exerted over another's personal property

24    in denial of or inconsistent with his rights therein." (*Fischer v. Machado,* 50 Cal. App. 4th 1069,

25    1072 (1996) (citing *Weiss v. Marcus,* 51 Cal. App. 3d 590, 599 (1975)).)  "To establish

26    conversion, plaintiff must establish an actual interference with his ownership or right of

27    possession[.]"  (*Ibid.*)  Damages are also an essential element of the cause of action for

28    conversion. (*Burlesci v. Petersen,* 68 Cal. App. 4th 1062, 1065 (1998).

18

1      Although this claim is alleged against TAIC and Oleski, it seems to focus primarily on

2   the Interloc notebook computers and to a lesser degree data that may have been on them. TAIC

3   and Oleski never had either and thus never received any of the alleged trade secret information

4   that forms the basis of the conversion claim. (Meyer Decl. ¶¶ 12-13; Oleski Decl. ¶¶ 15-15.)

5   Plaintiff does not have and cannot provide any such evidence or prove that TAIC or Oleski

6   substantially interfered with Interloc's right of possession. (*MDTV Med. News, Inc. v.*

7   *Weinstock*, 2007 U.S. Dist. LEXIS 8806 (S.D. Cal. 2007).) Plaintiff, therefore, cannot succeed

8   on this claim. TAIC does not and is not alleged to have the Interloc laptop computers that

9   Interloc cannot locate.

10               f.      **Plaintiff's Intentional Interference with Economic Relations**
                         **Claim Fails Because Interloc Cannot Prevent Former**
11                       **Employees from Continuing their Relationships with**
                         **Customers**
12

13      To establish a claim for intentional interference with prospective economic advantage the

14   plaintiff has the burden to prove: (1) an economic relationship between plaintiff and a third

15   party, with the probability of future economic benefit to the plaintiff; (2) defendant's knowledge

16   of the relationship; (3) an intentional wrongful act by the defendant, designed to disrupt the

17   relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff

18   proximately caused by the defendant's wrongful act. (*Korea Supply Co. v. Lockheed Martin*

19   *Corp.*, 29 Cal. 4th 1134, 1153-1154 (2003).) The intentional act must be "independently

20   wrongful," meaning, "proscribed by some constitutional, statutory, regulatory, common law, or

21   other determinable legal standard" (*Korea Supply, supra,* 29 Cal. 4th at p. 1159.)

22      Plaintiff claims that it is entitled to preclude individually named defendants and TAIC, its

23   competitor, from contacting or soliciting its customers. Both state and federal antitrust law

24   refute this contention.

25      California's policy favoring open competition is embodied in California Business and

26   Professions Code section 16600. Section 16600 provides that "every contract by which anyone

27   is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent

28   void." Whether parties by contract may even agree to reasonable restrictions prohibiting former

1   employees from soliciting clients is currently on review by the California Supreme Court.

2   *Edwards v. Arthur Andersen LLP,* 142 Cal. App. 4th 603, 620 (2007) (depublished by grant of

3   review).)  Even under current authority that somewhat allows parties to contract around these

4   restriction, such agreements must be narrowly drafted and construed.  (*See e.g. Golden State*

5   *Linen Service, Inc. v. Vidalin,* 69 Cal App 3d 1, 9 (1977) (employment contract providing in part

6   that the employee agreed to relinquish any right he may have acquired in and to the good will of

7   the employer's business upon termination was invalid and unenforceable since it would have

8   operated to restrain the employee from engaging in a lawful business); *Kolani v. Gluska,* 64 Cal.

9   App. 4th 402, 407 (1998).)

10      This becomes an academic point as Interloc does not claim there were any agreements in

11   place here.  Just as Nut, Rhodes, and Johnson did not sign employment contracts with Interloc,

12   apparently they did not sign non-solicitation or non -compete agreements.  Interloc cannot now

13   seek to impose limitations on these employee's post-employment activities that they could have

14   sought to impose by contract.  Instead of bargaining for limited, possibly valid non-solicitation

15   and non-compete contractual limitations, Interloc seeks to impose, through the injunction, an

16   overly broad limitation that would not withstand scrutiny if it were in a contract.  California law

17   does not allow such practices.

18      Moreover, courts have already held that the injunction Interloc seeks (against solicitation

19   of *any* of Interloc's current or prospective clients) is unlawful.  (*Gordon Termite Control v.*

20   *Terrones,* 84 Cal. App. 3d 176, 179 (1978) (refusing to enforce an agreement prohibiting an

21   employee from calling on any accounts he had called on while with former employer, finding

22   "knowledge of potential customers . . . is not a trade secret[.]").)  "One may do business with a

23   former employer's customers with whom one became personally acquainted and developed a

24   business relationship while formerly employed." (*Moss, Adams & Co. v. Shilling,* 179 Cal. App.

25   3d 124, 128-29 (1986) (citations omitted).)

26   ///

27   ///

28   ///

20

1

### 3.   Public Interest Favors Denial of the Requested Order as an Improper Restraint on Trade and Competition

2

3       As discussed above, Business & Professions Code section 16600 is an expression of

4  public policy that ensures that every citizen retains the right to pursue any lawful employment

5  and enterprise of his or her choice.  (*Kelton v. Stravinski*, 138 Cal. App. 4th 941, 946 (2006).)

6  The injunction sought by Interloc would violate this public policy and impede the rights of third

7  parties not represented in this litigation.

8       Not only would the restraint on trade and competition violate California Business &

9  Professions Code § 16600, it also potentially violates § 16700 *et seq*. and its federal corollary 15

10 U.S.C. § 1 *et seq*. which prohibit acts to prevent competition or to fix pricing.  As discussed

11 above, TAIC's primary market is the Federal Government such as the U.S. Marine Corps.

12 Interloc's focus is on State and Local Governmental agencies and some private commercial

13 entities.  Interloc seeks to keep the market divided along these lines, and preclude competition,

14 because it is a small and struggling company compared to others in the industry, like TAIC.  As

15 Interloc's business struggles, it cannot keep its employees from jumping ship and or its

16 customers from following those employees if they choose to.

17     ### C.   If the Court Re-Issues a Temporary Restraining Order or Grants a Preliminary Injunction, a Substantial Bond Is Required

18

19     As discussed above, TAIC would suffer substantial harm if the Court grants the

20 injunction.  These Defendants have already sought a $2,000,000 bond if the TRO is to remain in

21 place.  The harm caused by a prolonged restraint is much greater.  Thus, if the Court grants the

22 requested relief, the required bond should be no less than $5,000,000.  (Fed. R. Civ. Proc., Rule

23 65 (c).)

24 ///

25 ///

26 ///

27 ///

28 ///

SCI 17085222.8              OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1 | **IV.   CONCLUSION**

2 |     Based on the foregoing plaintiff's request for a Preliminary Injunction should be denied.

3 | DATED: August 13, 2007         SEYFARTH SHAW LLP

4

5 | By _____

6 |         James M. Nelson

        Diana R. Craig

7 |         Attorneys for Defendants

        TECHNOLOGY ASSOCIATES INTERNATIONAL

        CORPORATION and WALT OLESKI