SEYFARTH SHAW LLP
James M. Nelson (SBN 116442)
Diana R. Craig (SBN 221389)
400 Capitol Mall, Suite 2350
Sacramento, California 95814-4428
Telephone: (916) 448-0159
Facsimile: (916) 558-4839

Attorneys for Defendant
TECHNOLOGY ASSOCIATES INTERNATIONAL
CORPORATION

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERLOC SOLUTIONS, INC. | Case No. 2:07-CV-01534-LEW-GGH |
| Plaintiff, | **DECLARATION OF WALT OLESKI** |
| v. | |
| TECHNOLOGY ASSOCIATES INTERNATIONAL CORPORATION, WALT OLESKI, CHARLES JOHNSON, CHRIS RHODES, MICHAEL NUTT and DOES 1 THROUGH 10, inclusive, | |
| Defendants. | |

I, Walt Oleski, declare:

1. I am the President and Chief Executive Officer of Technology Associates International Corporation (TAIC) and have held this position since October 2005. I joined TAIC as a Vice President in 2003. I have personal knowledge of the matters set forth in this declaration, and if called to testify, I could and would competently testify thereto.

2. TAIC was founded in October 2000 as a small business enterprise providing consulting services to both public- and private-sector clients in the areas of Information Technology solutions (including GIS services), program and project management support, environmental resource management, as well as business and strategic asset management services.

SC1 17085427.2

1
DECLARATION OF WALT OLESKI IN SUPPORT
OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

3. TAIC has experienced considerable growth in various areas over the past 7 years. Although revenues in all of our practice areas do fluctuate based on acquiring individual contracts, strategic asset management has been one of TAIC's core competencies and generated significant revenues since its inception.

4. Historically, a large part of TAIC's strategic asset management business is with Federal Governmental customers, including the U.S. Marine Corps. TAIC developed a unique GIS integration that allowed special location in tracking assets for the U.S. Marine Corps MAXIMO application(s) – USMC-MAX. Developing a unique marketable application is rare in this area of this industry. Typically, all large scale strategic asset management competitors deal only with existing software, like MAXIMO, and assist customers with integrating and slight customization of MAXIMO to work with their other software systems.

5. I believe Charles Johnson started Eclipse's – now Interloc - strategic asset management division after leaving MRO. MRO was the company that developed MAXIMO, which was subsequently purchased by IBM. I believe Johnson knew many, if not all, of Interloc's future employees, as he hired them.

6. The movement of employees between TAIC and Interloc is not unusual. In 2005, TAIC employees left to join Eclipse in its strategic asset management division, which was new at the time. One of the four employees that left TAIC to build Interloc was Chris Rhodes. When Rhodes left he took at least three of TAIC's customers with him including King County along with TAIC client and prospect information. I continued to stay in touch with Rhodes on a professional (teaming, GIS, and industry) and personal level. Other TAIC employees recruited to Interloc include Steve Meisner, Jim Cullen and Jim Hershberger. I was told by Chris Rhodes that Interloc recruited Hershberger specifically in an effort to obtain and exploit TAIC's GIS capabilities/customers with respect to Interloc's strategic asset management, specifically MAXIMO. Hersheberger took with him, among others, TAIC's client The National Guard relationship and possibly work.

7.  The strategic asset management operations of both TAIC and Interloc provide consulting to customers of IBM MAXIMO software, although both firms could to the same for software companies like Oracle or SAP as well, depending on what a customer wants. TAIC does not generally re-sell MAXIMO software and believes that Interloc does not generally resell MAXIMO software as well. Rather, as companies providing MAXIMO integration services, both would interact with IBM who sells/sold the customer the software, as well as the end licensed user(s). TAIC then provides consulting services, which typically include installing MAXIMO, integrating it with customers existing software, and performing various industry standard tasks.

8.  IBM will assist any independent consultant or firm with marketing and sales presentations and can provide materials to help secure a sale, although advertising materials are uncommon. IBM will also help these independent consultants and/or firms develop bids and determine pricing by helping to determine, as an example, time estimates, and projected number of software licenses, etc. IBM can even assist with the writing and pricing of proposals, as well as providing IBM consulting services and the identification and/or introduction of prospective technical partners.. Some of IBM's available resources are shown on its web page at: http://www-1.ibm.com/partnerworld/ pwhome.nsf/weblook/ pub_benefits.html.

9.  As there is generally nothing unique or proprietary about customer marketing materials or bids, because IBM or perspective customers – especially State, local and Federal government – usually provide these materials for any independent consultant or firm interested in bidding, customers generally choose implementers based on capacity and individual personality(s). I cannot imagine anything Johnson, Nutt, and Rhodes could have allegedly downloaded that would have any independent value in this industry.

10. The customer base is well known within the MAXIMO product strategic asset management industry. These are/were largely listed on MRO's website and now IBM's website. This is in part because all legal licensee's of MAXIMO are registered by IBM, the software provider, and that information is shared/required by the consulting community to perform MAXIMO work. Firms and individuals providing consulting services are also connected and

3

regularly exchange information through industry groups like MAXIMO World (www.maximoworld.com), local MAXIMO user group meetings and industry webinar sessions. Employees working in this field are also well known. In many cases, for larger projects, competitive firms will team and interact and openly share information regularly throughout a client's project(s). TAIC had been approached in the past to team with Interloc – specifically on the re-compete for the USMC-MAX project in November of 2005.

11. In May of 2007 Rhodes, a former TAIC employee with whom I had remained in touch, called me and expressed an interest in returning to TAIC. Rhodes mentioned to me that Charles Johnson may also be interested in discussing opportunities with TAIC.

12. Shortly after Rhodes contacted me I received a call from Johnson. He said he was interested in discussing TAIC and meeting with me in person. He mentioned that he had a trip to San Diego coming up so we agreed to meet then. I understand that individuals at Interloc have alleged that I offered Johnson $500,000 to come to TAIC and steal Interloc's business. I never made this statement or any similar offer to Johnson. We had a general discussion about the industry and Johnson's frustrations with Interloc's management. We did not discuss details regarding Interloc.

13. After making these initial contacts, both Rhodes and Johnson left me a voice mail electing to stay at Interloc or possibly starting their own firm.. It was not until July 14, 2007, the day after he was fired, that Johnson again expressed an interest in TAIC. Johnson called me and tentatively agreed that he would join TAIC. Rhodes also called me on the 14th but we again only discussed general opportunities. On the 15th, however, Rhodes told me that he had wanted to return to TAIC. Michael Nutt followed Rhodes and Johnson. I asked Steve Meyer to work out their offer letters.

14. After TAIC hired Johnson, Nutt, and Rhodes, and before learning of Interloc's claims, I counseled each of these employees – as a routine of mine - that "there is nothing we want from your prior employer and we would never ask for or accept anything from your prior employer." This is a standard admonition I give to entering employees. At the time, Johnson, Nutt, and Rhodes joined TAIC, I was unaware of any downloads Johnson, Nutt, or Rhodes may

4

have made from Interloc's systems. If anything was downloaded by Johnson, Nutt, and Rhodes after they had decided to leave Interloc and join TAIC it was not at the direction of TAIC and done without TAIC's knowledge.

15. Since plaintiff initiated litigation, I believe Steve Meyer has counseled Johnson, Nutt, and Rhodes not to bring in or use anything that they may have downloaded from Interloc. I also believe that Meyer confirmed through TAIC's IT department, that no data has been uploaded to any of TAIC's systems from Johnson, Nutt, and Rhodes.

16. Since Johnson, Nutt, and Rhodes joined TAIC, it has acquired no contracts or revenue based on their contacts or that is associated with Interloc. One customer with a possible connection to Interloc, Aramark Senior Living Services, expressed an interest in following these individuals to TAIC but nothing resulted and all communications have ceased.

17. The order sought by plaintiff and granted by the court on a temporary basis would have devastating results to TAIC if continued. TAIC has long standing relationships and contracts with customers in areas other that strategic asset management that are also customers of Interloc for that limited purpose. For example SAIC, IBM, and Sempre are apparently Interloc strategic asset management customers whom TAIC has existing professional relationships.

18. Steve Meyer is a former CFO of SAIC. Interloc got this client lead when Jim Cullen left TAIC for Interloc. TAIC should not be barred from using its considerable independent contacts at SAIC or any other TAIC past or present clients or prospects to pursue strategic asset management opportunities or other business opportunities..

19. If TAIC could not communicate with IBM, as one of Interloc's alleged customers, it would be incredibly damaging to TAIC's business on many levels. First, as all MAXIMO Strategic Asset Management integration firms must work with IBM and their MAXIMO customers for software, manuals, templates. Barring TAIC from communicating with IBM would preclude it from performing any professional services for customers who want and/or use MAXIMO software.

SCI 17085427.2   DECLARATION OF WALT OLESKI IN SUPPORT
OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1  20. TAIC has an executed Term Sheet to acquire a company with an estimated 2007 20 million dollars in revenues per year. This company primarily resells IBM hardware. Any order prohibiting communication or contacts with IBM would preclude this transaction, costing TAIC in excess of 14.5 million in earnings alone this fiscal year.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct and that this declaration was executed on August 10, 2007 at Kortt (County), Colorado (State).

_____
Walt Oleski