DENNIS B. COOK, ESQ. (SBN 093432)
COOK BROWN, LLP
555 CAPITOL MALL, SUITE 425
SACRAMENTO, CALIFORNIA 95814
TELEPHONE NO.: 916-442-3100
FACSIMILE NO.: 916-442-4227

Attorneys for Defendant CHRIS RHODES

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERLOC SOLUTIONS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>TECHNOLOGY ASSOCIATES INTERNATIONAL CORPORATION, WALT OLESKI, CHARLES JOHNSON, CHRIS RHODES, MICHAEL NUTT and DOES 1 THROUGH 10, inclusive,<br><br>Defendants. | Case No. 2:07-CV-01534-LEW-GGH<br><br>**DECLARATION OF CHRIS RHODES IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:   August 17, 2007<br>Time:  10:00 a.m.<br>Ctrm:  9, 13th Floor<br>Judge: Honorable Ronald S.W. Lew |

I, CHRIS RHODES, hereby declare and state:

1. My recent employment history is as follows:

2. Since, July 16, 2007, I have been employed by Technology Associates International Corporation (TAIC) as Director, Operations. My primary duties consisted of development, management and oversight of the Strategic Asset Management Services group.

3. From June 2005 to July 15, 2007, I was employed by Interloc Solutions, Inc. (Interloc) as Director, Training and Business Process Engineering and at the time of resignation Director, Sales. At Interloc, my primary duties were developing new business and outlining process methodologies on how to work efficiently with the Professional Services group. These are things that I had already performed and successfully accomplished for three other employers. My direct supervisor was Charles Johnson.

4. From January 2005 to June 2005, I was employed by Eclipse, Inc. Interloc was spun

off from Eclipse in and around June 2005 and, as noted, I became an employee of Interloc.

5. I was previously employed by TAIC as a MAXIMO Project Manager from December 2003 to January 2005 and performed the same type of work then as I do now.

6. I was self-employed as President/CEO of Choice Solutions, Inc. from October 2002 through December 2003 and built my own MAXIMO consulting practice performing the same work I do now.

7. Prior to this time, I was employed by MRO Software, the maker of Maximo Software, from July 1997 to October 2002. During that time I was a Principal Consultant for the first 4 years and the Client Services Manager for the Midwest region and several named accounts for the last year. I had made several client relationships over that 5 year period.

8. With respect to my employment at Interloc, at no time before Charles Johnson was terminated, did I have any knowledge that Mike Watson, Interloc's Chief Executive Officer, intended to fire Johnson. I did not find out that Johnson had been fired until late afternoon on Friday, July 13, when I was reloading my laptop software to meet with clients the next week. I was having trouble with a VM Ware image that had been created by Jason Venhuizen allowing me to run Maximo but that quit working around noon Friday, July 13th, 2007. I talked with Greg Dukelow, Senior Technical Consultant on rebuilding my laptop not using VM Ware and he suggested using BEA Weblogic which is one of the items I downloaded from the Interloc server, this was prior to having any knowledge that Mr. Johnson had been fired. I was also working with Jason Venhuizen, Interloc's Vice President of Products and Technology, at that time to transfer software from Interloc's server to my laptop because I had questions on how and what to download regarding the SQL Server DB software which is free on MicroSoft's website but I had decided to use Interloc's server because it was easier to find and the service pack was also readily available, again free from Microsoft. Jason Venhuizen told me that I would need to download the SQL Server 2000 Developers addition and the service pack, which I did. During these efforts, Venhuizen told me that Watson had fired Johnson. This was the first time that I heard that Johnson had been fired.

9. Contrary to the allegation in Paragraph 16, of the Complaint, I did not secretly initiate a sizable download of data from Interloc's computer system. The software that I

downloaded on July 13, 2007 was with Venhuizen's full knowledge and consent and consisted of a SQL Server and BEA Web Logic. These applications are needed to run Maximo and were necessary at that time to visit clients the next week. I did not download anything from Interloc's server thereafter. Contrary to the allegations in Paragraph 27 of the Complaint, I did not download any human resource information, proposals to clients, methods, project plans, documented methodologies, software products for the product developed by Interloc, or other software products as described therein.

10. I spoke to Mike Watson once on July 13, 2007 around 5:00 p.m. concerning Johnson's termination. Contrary to the allegations in Paragraphs 17 and 18 of the Complaint, I did not have two conversations with him. Watson told me that Johnson had been terminated and asked me to stay with Interloc. I told him that I intended to stay with Interloc.

11. At no time after Johnson's initial reply to TAIC on May 24th or before Johnson's termination did I have a conversation with Charles Johnson about whether he intended to leave Interloc and join TAIC. Neither did I talk to anyone at TAIC about leaving Interloc and joining TAIC. I intended to stay with Interloc and was not looking to make a change in my employment. I had no conversations with any Interloc employee or client before Johnson was terminated about leaving Interloc and going to TAIC, except Jason Venhuizen who wanted to leave and go to TAIC without Charles Johnson. Regarding the allegations in Paragraph 12 of the Complaint, I have known Walt Oleski for several years and we have always stayed in touch. Charles Johnson had contacted me asking about suggestions for investors, I recommended he talk with Walt Oleski and contacted Walt letting him know that Charles would be contacting him. Interloc and TAIC had started to talk with each other prior to this, as some partnering opportunities had arisen. Charles Johnson already had TAIC's contact information, I just suggested an investor. Charles Johnson coordinated and set up the meeting between himself and Walt Oleski, TAIC's President and Chief Executive Officer, in May 2007.

12. The first time that I talked to Charles Johnson about his termination was late Friday night, July 13, 2007. Johnson and I are friends and had worked together for many years. Johnson was upset and emotional about being fired and I told him to calm down and that I would talk to him

again over the weekend.

13. I spoke to Johnson Saturday morning. This is the first time that TAIC was mentioned. After that discussion I contacted Walt Oleski to see if the three of us could talk about an opportunity at TAIC, that was about noon, MST. Walt Oleski did not have time to talk then so he asked that I set up a conference call between him, Charles Johnson and myself for 2:00pm MST. During that conference call, I spoke to Johnson and Oleski about joining TAIC. At that point, I had made no decision about whether to leave Interloc and join TAIC. Johnson and I were friends, and I was not happy that Watson had fired him for what I believed to be weak reasons. I also knew TAIC having worked there before. At the end of these conversations, I told Johnson and Oleski that I would think about my options and get back to them. Contrary to the allegations in Paragraph 21 and 25 of the Complaint, I did not make a decision to resign from Interloc and bring business I developed for Interloc with me to TAIC on Saturday, July 14, 2007.

14. I thought long and hard about my options Saturday, July 14th and Sunday, July 15, 2007. I received an offer letter from TAIC Sunday morning. After much consideration, I decided that I would leave Interloc and join TAIC effective Monday, July 16, 2007. Therefore, on or about 12:15 a.m. on Monday, July 16, 2007, I sent an e-mail to Mike Watson resigning my employment. I also sent to Watson at that time several transition documents concerning work in progress to assist Interloc in servicing clients for whom I was currently doing work. These transition documents included a list of clients, contact persons, telephone numbers, work-in-progress, a Statement of Work for the Port of Tacoma and a forecast list for potential Dexterra clients.

15. On and after July 16, 2007, I told several Interloc employees that I quit Interloc and joined TAIC and my reasoning for doing so. Some of these employees wanted to stay with Interloc and some wanted to come over to TAIC. I did not pressure any Interloc employee to leave his/her employment and join TAIC. Contrary to the allegation in Paragraph 29 of the Complaint, I did not submit the resume of Interloc employee Steve Misner to a potential client. I also did not tell Jim Charboneau that Steve Misner was leaving.

16. My laptop had personal and business contact information in Microsoft Outlook. I wanted that information to notify friends and business associates of my change of employment. On

M:\LTJ\Rhodes\pld\Declaration of Chris Rhodes.doc

Declaration of Chris Rhodes in Support of Opposition to Motion for Preliminary Injunction (2:07-CV-01534-LEW-GGH)
4

or about July 16, 2007, I copied contact information for that purpose only. I also personally purchased or downloaded software that I put on my laptop, such as Snag It, SOTI, 7zip, WinRAR, Firefox, ISO Recorder and Print Drivers which I removed from the Interloc laptop. This software was not purchased or owned by Interloc. I sent back my laptop to Interloc as soon as I was able. Contrary to the allegation in Paragraph 31 of the Complaint, Interloc did not provide me a FedEx account number to return my laptop.

17. The majority of clients that I worked with while at Interloc, and over 90% of the Outlook contact list, were clients that I had developed while I was at MRO Software, when I was self-employed and while I previously worked for TAIC. In other words, the clients followed me from my own business to TAIC then to Interloc. There was no effort at Interloc to keep a confidential client list. It is standard industry practice that clients often follow their contact to new employers as was the case with me when I joined Interloc in the first place. I have not solicited these or other clients to leave Interloc and transfer their business to TAIC. I have talked to some clients only to notify them of my new employment. One small client, Era Living, called and asked me to continue to do work for them. I did not solicit this work.

I have read the foregoing declaration consisting of 5 pages and declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and if called upon to testify, would testify the same.

Dated this 13th day of August, 2007 at Pocatello, Idaho.

_____
Chris Rhodes